FILED UNDER SEAL

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO: _____ |
| v. | : | DATE FILED: _____ |
| JOSH S. VERNE | : | VIOLATIONS: |

VIOLATIONS:
15 U.S.C. §§ 78j(b) & 78ff and 17 C.F.R.
§ 240.10b–5 (securities fraud – 3 counts)
18 U.S.C. §§ 1343, 1349 (wire fraud – 22 counts)
18 U.S.C. § 1028A (aggravated identity theft
– 1 count)
18 U.S.C. § 1513(e) (witness retaliation – 1 count)
18 U.S.C. § 1512(b)(1) (witness intimidation and
attempted witness intimidation – 1 count)
18 U.S.C. § 2 (aiding and abetting)
Notice of forfeiture

## I N D I C T M E N T

### COUNT ONE
(Securities Fraud – Ownable and Ownable Capital)

THE GRAND JURY CHARGES THAT:

At all times material to this indictment:

*The Defendant*

1.      Defendant JOSH S. VERNE, now a resident of Fort Lauderdale, Florida, was a resident of Gladwyne, Pennsylvania.

2.      Defendant JOSH S. VERNE held himself out as a wealthy and successful businessman, entrepreneur, and investor. Defendant VERNE used this false image to carry out a series of schemes through which he defrauded dozens of investors, prospective investors, employees, and business partners out of millions of dollars.

3.      Defendant JOSH S. VERNE carried out his activities through a series of limited liability companies of which he was the chief executive and over which he maintained effective control.

### The Ownable-Ownable Capital Investment Fraud

4.      Defendant JOSH S. VERNE's family had run a wholesale furniture business known as Home Line Furniture Industries ("Homeline Furniture") for many years. When defendant VERNE's father and uncle decided to retire, they turned the business over to defendant VERNE and defendant VERNE's cousin. Within several years, the business had become insolvent, was subject to involuntary bankruptcy proceedings, and was closed.

5.      After the closure of Homeline Furniture, defendant JOSH S. VERNE began a business, "WorkPays.me," an online marketplace where consumers would buy products through direct payroll deduction. Defendant VERNE sold this business in about March 2014 for a total of about $6 million. Defendant VERNE personally realized no more than about $5 million of the sale price as other investor/owners also needed to be paid out of the proceeds.

6.      After his sale of WorkPays.me, defendant JOSH S. VERNE began another business, FlockU LLC ("FlockU"), an online content platform for college students. Defendant VERNE raised a substantial amount of capital to fund FlockU. Among the investors that defendant VERNE convinced to fund FlockU was Investor A.

7.      Investor A was a well-known and well-connected member of the Philadelphia business community with a reputation for financial acumen. Investor A made initial investments into FlockU totaling about $1 million. Investor A's willingness to invest, and the size of his investment, were based on a personal presentation that defendant JOSH S. VERNE made to Investor A at Investor A's home. In this presentation, among other things, defendant VERNE: (i) falsely represented his prior business success, including that he had sold

2

WorkPays.me for $90 million; (ii) falsely represented that his personal net worth was in excess of $100 million; and (iii) showed Investor A a copy of a document that purported to be an account statement from Goldman Sachs that showed family holdings for defendant VERNE of more than $50 million (the "Goldman Sachs Portfolio Statement").

8.      The Goldman Sachs Portfolio Statement was forged and fabricated. In truth and in fact, defendant JOSH S. VERNE did not have an investment account at Goldman Sachs in his own name or in his family's names, much less an account with a market value of more than $50 million.

9.      The FlockU business was not successful, and in or about April 2018, defendant JOSH S. VERNE sold the assets of the FlockU business for one dollar.

10.     Defendant JOSH S. VERNE conceived a business plan for a new business, to be called Ownable, that would allow consumers to purchase high-end consumer electronics products from retailers, using funds made available by Ownable. Pursuant to the business plan, Ownable would charge its consumer-customers a rent-to-own fee that would, over time, provide the consumer-customer with title to the purchased electronics item.

11.     To initiate this new business, defendant JOSH S. VERNE changed the name of FlockU LLC to Ownable LLC ("Ownable") in or about 2018. Defendant VERNE served as Ownable's chief executive officer from its renaming until he was dismissed in about the fall of 2020.

12.     Despite the failure of FlockU, defendant JOSH S. VERNE convinced Investor A to make new investments in Ownable, with an initial investment of approximately $150,000 in or about August 2018, followed by a conversion of his FlockU debt to equity in Ownable.

13.    Investor A's decision to invest in Ownable, and the size of his investment, were based, among other things, on: (i) defendant JOSH S. VERNE's false representation that defendant VERNE was investing approximately $2 million to $3 million of his own additional funds in Ownable; (ii) defendant VERNE's asserted prior business success, including that he had sold WorkPays.me for $90 million; (iii) defendant VERNE's false representation that his personal net worth was in excess of $100 million; and (iv) the false Goldman Sachs Portfolio Statement.

14.    Defendant JOSH S. VERNE raised funds for Ownable through the sale of units. These units at all times were securities for the purposes of federal securities law.

15.    In connection with the sale of units in Ownable ("Ownable Units"), defendant JOSH S. VERNE provided to each investor a Limited Liability Company Agreement (the "Ownable Operating Agreement") and a Subscription Agreement (the "Ownable Subscription Agreement"). Defendant VERNE signed the Ownable Operating Agreement and the Ownable Subscription Agreements on behalf of Ownable as its chief executive officer.

16.    In the Ownable Subscription Agreements, defendant JOSH S. VERNE represented that the Ownable Units were securities.

17.    In the Ownable Subscription Agreements, defendant JOSH S. VERNE identified only one purpose for which the proceeds from the sale of Ownable Units would be used: "to develop a digital membership and shopping platform for the rent to own market." The Ownable Subscription Agreements did not provide that any of the proceeds would be used to fund the prior debts or obligations of Ownable or of its predecessor company, or to pay the personal debts, expenses, or obligations of defendant VERNE.

4

18. The Ownable Subscription Agreements signed by defendant JOSH S. VERNE included a "Risk Factors Supplement," which purported to itemize a "representative listing" of risks "currently contemplated" as potentially involved in an investment in Ownable. This supplement consisted of 25 delineated risks, along with an explanation of each. None of the listed risks identified the misapplication of funds by defendant VERNE as a contemplated risk.

19. In or about November 2018, defendant JOSH S. VERNE formed a new related business, to be called Ownable Capital Partners I LLC ("Ownable Capital"), which would provide capital financing for the acquisition of Ownable's inventory. Defendant VERNE was Ownable Capital's chief executive officer.

20. Defendant JOSH S. VERNE raised funds for Ownable Capital through the sale of interests in Ownable Capital that represented ownership in the Ownable Capital enterprise ("Capital Interests"). The Capital Interests were securities for the purposes of federal securities law.

21. In connection with the sale of Capital Interests, defendant JOSH S. VERNE provided to each investor a Private Placement Memorandum (the "Capital Placement Memo") and an Ownable Capital Agreement (the "Capital LLC Agreement"). Defendant VERNE signed the Capital LLC Agreement and the Capital Placement Memo on behalf of Ownable Capital as its chief executive officer.

22. In the Capital Placement Memos signed by him, defendant JOSH S. VERNE represented that the Capital Interests were securities.

23. In the Capital Placement Memos, defendant JOSH S. VERNE identified three purposes for which the proceeds from the sale of Capital Interests would be used: (i) establishing, implementing, and administering a rent to own e-commerce business; (ii) paying

the costs and expenses associated with offering the Capital Interests; and (iii) paying the ongoing expenses and liabilities of Ownable Capital.

24.    The Capital Placement Memos signed by defendant JOSH S. VERNE had attached as Exhibit B a schedule of uses of funds raised from the sale of the Capital Interests. That schedule identified a maximum of 3.3% as being used for legal fees, a maximum of 1.3% as being used for "miscellaneous," and the remaining 95.4% to 99.3% being used for "business operations and working capital."

25.    Neither the Capital Placement Memos, nor the attached schedule of uses of funds, provided that any of the proceeds would be used to fund the debts or obligations of Ownable or of its predecessor company, or to pay the personal debts, expenses, or obligations of defendant JOSH S. VERNE.

26.    The Capital Placement Memos signed by defendant JOSH S. VERNE included a list of "Risk Factors," which purported to itemize a list of risks that a potential investor should "carefully consider." This list consisted of 35 delineated risks, along with an explanation of each. None of the listed risks identified misapplication of funds by defendant VERNE as a contemplated risk. In fact, the identified risk of broad management discretion advised that defendant VERNE could only use funds of Ownable Capital for "proper business purposes" of that company.

27.    Defendant JOSH S. VERNE convinced potential investors to invest in Ownable and Ownable Capital by (i) falsely representing that he had sold WorkPays.me for tens of millions of dollars and (ii) falsely representing that he had made new investments of millions of his own dollars in the businesses.

6

28.    Defendant JOSH S. VERNE obtained immediate credibility for Ownable and Ownable Capital, and for himself, by telling potential investors that Investor A was a major investor in these businesses. When asked by others, Investor A, acting in reliance on defendant VERNE's representations to Investor A, generally confirmed that he had invested in Ownable and Ownable Capital and typically relayed that he had seen the Goldman Sachs Portfolio Statement which showed that defendant VERNE had holdings of in excess of $50 million. Defendant VERNE did not tell potential investors that Investor A had been induced to invest in Ownable and Ownable Capital based on false representations and forged documents.

29.    As Ownable's and Ownable Capital's chief executive officer, defendant JOSH S. VERNE reported to advisory boards of directors. Defendant VERNE, however, had access to and effective day-to-day control over the conduct of Ownable's and Ownable Capital's businesses and the deposits of funds to, and the withdrawal of funds from, those companies' bank accounts.

30.    During the time that he was chief executive officer, defendant JOSH S. VERNE repeatedly told the advisory boards and investors in Ownable and Ownable Capital that the companies were financially successful and that their bad debt was within acceptable limits. Defendant VERNE used these false representations to raise additional capital for Ownable and Ownable Capital and to maintain his position as those companies' chief executive officer.

31.    In fact, the financial situations of Ownable and Ownable Capital were so far deteriorated and tenuous, and their resources had been so far impaired, that defendant JOSH S. VERNE resorted to borrowing funds from employees and others in order to meet such ordinary business needs as purchases of inventory.

7

32.    Defendant JOSH S. VERNE repeated and amplified his claims that funds raised for Ownable and Ownable Capital would be used solely for those companies' business purposes by telling their advisory boards and investors that he was not taking any salary as a result of his work for Ownable and Ownable Capital, but would be compensated solely through the anticipated increase in the value of his personal investment in those companies.

33.    Despite his representations that company funds would be used solely for legitimate business purposes, and despite his obligation to his employees, investors, and companies, defendant JOSH S. VERNE repeatedly used funds that had been raised for business purposes, and funds belonging to Ownable and Ownable Capital, for his own personal purposes. Among other things, defendant VERNE improperly diverted to his own personal use business and investor funds to finance an affluent lifestyle that he could not afford, such as renovations to a showcase vacation property at the New Jersey Shore; travel on private jets; contributions to political candidates; personal charitable contributions; expenditures on his daughter's bat mitzvah; and country club payments. Defendant VERNE also used business and investor funds to make payments to prior investors in entities unrelated to Ownable or Ownable Capital and to fund investments in other ventures.

## THE SECURITIES FRAUD SCHEME

34.    From at least in or about 2018, through at least in or about October 2020, in the Eastern District of Pennsylvania and elsewhere, defendant

### JOSH S. VERNE

unlawfully, willfully, and knowingly, directly and indirectly, by use of the means and instrumentalities of interstate commerce, used and employed, and aided and abetted the use and employment of, manipulative and deceptive devices and contrivances, in violation of Title 17,

8

Code of Federal Regulations, Section 240.10b–5, by: (a) employing devices, schemes and artifices to defraud; (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices and courses of business which operated and would operate as a fraud and deceit upon any person, in connection with the purchase and sale of securities of Ownable LLC and Ownable Capital Partners I LLC.

All in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b–5, and Title 18, United States Code, Section 2.

## COUNTS TWO AND THREE
### (Wire Fraud – Ownable and Ownable Capital)

**THE GRAND JURY FURTHER CHARGES THAT:**

1. Paragraphs 1 through 33 of Count One are incorporated here.

### THE SCHEME TO DEFRAUD

2. From in or about 2018 through at least in or about October 2020, in Philadelphia, in the Eastern District of Pennsylvania and elsewhere, defendant

### JOSH S. VERNE

devised and intended to devise a scheme to defraud investors, prospective investors, and employees of Ownable LLC ("Ownable") and Ownable Capital Partners I LLC ("Ownable Capital"), and to obtain money and property by means of false and fraudulent pretenses, representations, and promises.

### MANNER AND MEANS

It was part of the scheme that:

3. Defendant JOSH S. VERNE made misrepresentations to investors, prospective investors, and employees about his prior business and entrepreneurial experience, mischaracterizing the financial results of his prior businesses in order to induce investors and potential investors to make investments in Ownable and Ownable Capital.

4. Defendant JOSH S. VERNE made misrepresentations to investors, prospective investors, and employees about his personal financial position and wealth, falsely claiming a personal net worth of tens of millions of dollars, in order to induce investors and potential investors to make investments in Ownable and Ownable Capital.

5. Defendant JOSH S. VERNE made misrepresentations to investors, prospective investors, and employees about his personal investment in Ownable and Ownable

10

Capital, mischaracterizing the amount and timing of his alleged investments in order to induce investors and potential investors to make investments in Ownable and Ownable Capital.

6.      Defendant JOSH S. VERNE made personal guarantees to investors and prospective investors in order to induce them to make investments in Ownable and Ownable Capital while knowing that his guarantees were worthless and misleading.

7.      Defendant JOSH S. VERNE provided investors and prospective investors with offering documents in order to induce them to make investments in Ownable and Ownable Capital while knowing that those documents contained false and misleading representations and that they failed to disclose information needed to make them not false and misleading.

8.      Defendant JOSH S. VERNE misused investor funds that were intended for investment in Ownable and Ownable Capital for purposes unrelated to these businesses, including for his own personal use and benefit.

9.      Defendant JOSH S. VERNE misused funds belonging to Ownable and Ownable Capital for purposes unrelated to these businesses, including for his own personal use and benefit.

10.     Defendant JOSH S. VERNE misrepresented to investors, potential investors, and the boards of Ownable and Ownable Capital the financial condition of Ownable and Ownable Capital to induce investors and potential investors to make investments in Ownable and Ownable Capital, and in order: (i) to induce investors not to withdraw their funds, (ii) to maintain his positions of authority and control over Ownable and Ownable Capital and their assets, and (iii) to delay and prevent discovery by law enforcement of his own misconduct.

11.     Defendant JOSH S. VERNE misrepresented to investors, potential investors, and the boards of Ownable and Ownable Capital that he was not receiving

11

compensation from Ownable and Ownable Capital when, in truth and in fact, defendant VERNE was using these companies' bank accounts to fund his own affluent personal lifestyle.

12. Defendant JOSH S. VERNE sent communications, and caused communications to be sent, to investors, employees, and the boards of Ownable and Ownable Capital acknowledging that he had made errors and had committed some misconduct in order: (i) to induce investors not to withdraw their funds, (ii) to maintain his positions of authority and control over Ownable and Ownable Capital and those companies' assets, and (iii) to delay and prevent discovery by law enforcement of his own misconduct.

## THE WIRINGS

13. On or about each of the dates set forth below, in the Eastern District of Pennsylvania, and elsewhere, having devised and intending to devise this scheme, defendant

## JOSH S. VERNE,

for the purpose of executing the scheme described above, caused to be transmitted by means of wire communication in interstate and foreign commerce the signals and sounds described below, each transmission constituting a separate count:

| COUNT | APPROXIMATE DATE (AND TIME) | DESCRIPTION |
|---|---|---|
| 2 | November 27, 2019 | Wire transfer of $300,000 by Investor CY from TD Bank in the Eastern District of Pennsylvania to Ownable's TD Bank account through TD Bank's server in Canada |
| 3 | March 22, 2020, at 4:46 p.m. | Email transmission of response email entitled "Please read," from defendant JOSH S. VERNE, through Gmail servers outside the Commonwealth of Pennsylvania, to Employee 2 in the Eastern District of Pennsylvania |

All in violation of Title 18, United States Code, Section 1343.

## COUNTS FOUR THROUGH SEVEN
### (Wire Fraud – Unauthorized Sale and Forgery Involving Ownable Units)

**THE GRAND JURY FURTHER CHARGES THAT:**

1.  Paragraphs 1 through 33 of Count One are incorporated here.

2.  An individual identified here as "Employee 1" was a lifelong friend of defendant JOSH S. VERNE. Defendant VERNE hired Employee 1 as a management officer of Ownable. As part of his compensation for his position and employment for Ownable, Employee 1 acquired units in Ownable (the "Employee 1 Ownable Units").

3.  Employee 1 resigned from Ownable in or about February 2020. Employee 1 retained ownership of his Ownable Units after his termination of his employment with the company.

4.  On or about March 9, 2020, defendant JOSH S. VERNE entered into an agreement to sell the Employee 1 Ownable Units to another individual, identified here as Investor K. This agreement was made without the knowledge or approval of Employee 1.

5.  Defendant JOSH S. VERNE convinced Investor K to purchase the Employee 1 Ownable Units by: (i) falsely representing Ownable's financial condition; (ii) falsely representing that defendant VERNE had invested millions of his own dollars into Ownable; and (iii) representing that Investor A was a board member and investor in the business.

6.  Defendant JOSH S. VERNE forged, or caused to be forged, Employee 1's name to the sales agreement for the Employee 1 Ownable Units, without the knowledge, permission, or approval of Employee 1.

7.  On or about March 9, 2020, Investor K paid defendant JOSH S. VERNE approximately $150,000 for the Employee 1 Ownable Units without knowledge of the fact that

13

Employee 1's signature had been forged on the sales agreement and that defendant VERNE did not have legal authority to transfer ownership of these units to Investor K.

8.    Defendant JOSH S. VERNE never turned over to Employee 1 the approximately $150,000 that he had obtained from the sale of the Employee 1 Ownable Units that were in fact owned by Employee 1. Instead, defendant VERNE misapplied these funds, including by using them to make an overdue $100,000 payment to an Ownable Capital investor and to make a payment to his own personal bank account.

9.    On or about April 24, 2020, defendant JOSH S. VERNE sent an email to Investor K urging Investor K to invest more funds in Ownable. To support this request, defendant VERNE made misleading statements about Ownable's prospects, including that Ownable was "well positioned" to welcome millions of additional customers. Defendant VERNE did not provide information about Ownable's tenuous financial condition or the fact that defendant VERNE had been misappropriating Ownable's funds.

10.    On or about October 12, 2020, defendant JOSH S. VERNE sent a text message to Employee 1 denying that he had forged anything, but admitting that he had sold $100,000 of stock "to go into the business," and admitting that he was personally responsible for paying the "full am[oun]t" to Employee 1.

## THE SCHEME TO DEFRAUD

11.    From in or about February 2020 through at least in or about October 2020, in Philadelphia, in the Eastern District of Pennsylvania and elsewhere, defendant

### JOSH S. VERNE

devised and intended to devise a scheme to defraud Employee 1 and Investor K and to obtain money and property by means of false and fraudulent pretenses, representations, and promises.

14

## MANNER AND MEANS

It was part of the scheme that:

12.    Defendant JOSH S. VERNE knew that when Employee 1 left his employment at Ownable, he still owned the Employee 1 Ownable Units.

13.    Defendant JOSH S. VERNE convinced Investor K to invest in Ownable by making misrepresentations, and by failing to disclose facts that defendant VERNE knew would be material to a reasonable investor, including about defendant VERNE's prior business and entrepreneurial experience, his financial position and personal wealth, and the financial condition of Ownable. Defendant VERNE failed to disclose to Investor K that defendant VERNE was misapplying the funds of Ownable and using them for defendant VERNE's own personal benefit.

14.    Defendant JOSH S. VERNE falsely told Investor K that the Employee 1 Ownable Units were available for purchase because Employee 1 was selling them at the request of Employee 1's spouse. Defendant VERNE also falsely represented to Investor K that defendant VERNE was authorized to sell the Employee 1 Ownable Units for Employee 1.

15.    In order to keep Employee 1 from learning that defendant JOSH S. VERNE had located a purchaser for the Employee 1 Ownable Units, defendant VERNE signed or caused to be signed Employee 1's name to the sales agreement for the Employee 1 Ownable Units, without the knowledge, permission, or approval of Employee 1.

16.    Defendant JOSH S. VERNE obtained payment of approximately $150,000 from Investor K in return for purporting to sell the Employee 1 Ownable Units.

17.    Defendant JOSH S. VERNE failed to turn over to Employee 1 the proceeds that he received from Investor K in return for the Employee 1 Ownable Units. Instead,

15

defendant VERNE used those funds for other purposes, such as making payments to himself and to a prior business investor.

18. Defendant JOSH S. VERNE sent communications, and caused communications to be sent, to Employee 1 and others acknowledging that he had sold some of the Employee 1 Ownable Units, and purporting to personally guarantee payment to Employee 1, in order to induce Employee 1 not to report defendant VERNE's forgery, in order to maintain his positions of authority and control over Ownable and Ownable Capital and those companies' assets and to delay and prevent discovery by law enforcement of his own misconduct.

19. Having induced Investor K to purchase Employee 1's Ownable Units by supplying Investor K with false and incomplete information, defendant JOSH S. VERNE convinced Investor K to make an additional follow-on investment into Ownable by failing to correct the false and incomplete information he had previously supplied and by providing additional false and incomplete information to Investor K.

## THE WIRINGS

20. On or about each of the dates set forth below, in the Eastern District of Pennsylvania, and elsewhere, having devised and intending to devise this scheme, defendant

## JOSH S. VERNE,

for the purpose of executing the scheme described above, caused to be transmitted by means of wire communication in interstate and foreign commerce the signals and sounds described below, each transmission constituting a separate count:

16

| COUNT | APPROXIMATE DATE AND TIME | DESCRIPTION |
|---|---|---|
| 4 | March 9, 2020, at 11:03 a.m. | Internet transmission of email concerning executed purchase agreement for Employee 1 Ownable Units from Employee 3 in the Commonwealth of Pennsylvania to defendant JOSH S. VERNE, through the Ownable server outside the Commonwealth of Pennsylvania |
| 5 | March 9, 2020, at 11:03 a.m. | Internet transmission of email concerning executed purchase agreement for Employee 1 Ownable Units from defendant JOSH S. VERNE, via AOL in a state other than Commonwealth of Pennsylvania to Investor K in the Eastern District of Pennsylvania |
| 6 | April 24, 2020, at 2:37 p.m. | Internet transmission of email concerning Ownable capital call from defendant JOSH S. VERNE, through the Ownable server outside the Commonwealth of Pennsylvania, to Investor K in the Eastern District of Pennsylvania |
| 7 | October 12, 2020, at 4:14 p.m. | Text message from defendant JOSH S. VERNE, outside the Commonwealth of Pennsylvania, to Employee 1 in the Eastern District of Pennsylvania |

All in violation of Title 18, United States Code, Section 1343.

17

## COUNT EIGHT
### (Aggravated Identity Theft)

**THE GRAND JURY FURTHER CHARGES THAT:**

1.      Paragraphs 1 through 33 of Count One are incorporated here.

2.      Paragraphs 1 through 10 and 12 through 19 of Counts Four through Seven are incorporated here.

3.      On or about March 9, 2020, in the Eastern District of Pennsylvania, defendant

### JOSH S. VERNE

knowingly and without lawful authority transferred, possessed, and used, a means of identification of another person, that is, the name of Employee 1, during and in relation to the wire fraud as charged in Counts Four through Seven.

In violation of Title 18, United States Code, Section 1028A(a)(1), (c)(5).

## COUNTS NINE THROUGH TEN
### (Wire Fraud – $850,000 Personal Loan)

**THE GRAND JURY FURTHER CHARGES THAT:**

1.      Paragraphs 1 through 33 of Count One are incorporated here.

2.      In or about January 2020, defendant JOSH S. VERNE told Investor A that he was facing serious short term liquidity problems. Defendant VERNE represented to Investor A that defendant VERNE had more than enough assets, that they were tied up in investments, and that he would shortly have access to some of his substantial invested funds.

3.      Defendant JOSH S. VERNE asked Investor A to provide him with a short-term personal loan until he could liquidate some of his investments. In support of his request, defendant VERNE met with Investor A and presented Investor A with another version of the Goldman Sachs Portfolio Statement, this one bearing a date of October 31, 2019 (the "Goldman Sachs Portfolio Statement II").

4.      Defendant JOSH S. VERNE represented to Investor A that the money was needed to fund existing investments of his that required immediate capital infusions, and specifically an investment in a company known as Dropps.

5.      Like the Goldman Sachs Portfolio Statement that he had previously shown to Investor A, the Goldman Sachs Portfolio Statement II showed that defendant JOSH S. VERNE and his family had assets at Goldman Sachs with a market value in excess of $50 million. Also like the earlier version shown to Investor A, the Goldman Sachs Portfolio Statement II was false, fraudulent, and forged as neither defendant VERNE nor his family had an investment account with, or assets at, Goldman Sachs.

6.      In further support of his request for a personal loan from Investor A, defendant JOSH S. VERNE represented to Investor A that Acquaintance 1 was his broker at

Goldman Sachs. While Acquaintance 1 was an employee of Goldman Sachs, and while Acquaintance 1 was a social acquaintance of defendant VERNE and was an investor in Ownable, she at no time was defendant VERNE's broker, nor did she have any banking relationship with defendant VERNE and his family.

7.      Based on the false and fraudulent representations of defendant JOSH S. VERNE, and based on the two forged Goldman Sachs Portfolio Statements, Investor A provided defendant VERNE with a $850,000 personal loan.

8.      On or about January 13, 2020, defendant JOSH S. VERNE signed a promissory note in the amount of $850,000 to support the personal loan granted to him by Investor A.

## THE SCHEME TO DEFRAUD

9.      From in or about January 2020 through at least in or about March 2020, in Philadelphia, in the Eastern District of Pennsylvania and elsewhere, defendant

## JOSH S. VERNE

devised and intended to devise a scheme to defraud Investor A and to obtain money and property by means of false and fraudulent pretenses, representations, and promises.

## MANNER AND MEANS

It was part of the scheme that:

10.      Defendant JOSH S. VERNE falsely claimed to have great financial and business acumen, to have accumulated great wealth from his business endeavors, and to have the economic resources to back his financial guarantees and to repay personal debts and obligations.

11.      Defendant JOSH S. VERNE had little capital and was using business assets and personal loans to finance an extravagant lifestyle for himself and his family.

20

12. To meet his cash needs, defendant JOSH S. VERNE requested a personal loan from Investor A.

13. Defendant JOSH S. VERNE fabricated a document that purported to be a statement of account from Goldman Sachs (the "Goldman Sachs Portfolio Statement II"), which purported to show that defendant VERNE and his family had assets at Goldman Sachs with a market value in excess of $50 million.

14. In order to convince Investor A to provide him with a personal loan, defendant JOSH S. VERNE represented to Investor A that he had sufficient assets to repay a $850,000 personal loan and showed Investor A the false Goldman Sachs Portfolio Statement II as proof of his false representation.

15. In order to convince Investor A to provide him with a personal loan, defendant JOSH S. VERNE represented to Investor A that the funds would be used for urgent investment purposes.

16. Defendant JOSH S. VERNE obtained an $850,000 personal loan from Investor A.

17. Defendant JOSH S. VERNE used funds from the $850,000 personal loan from Investor A for purposes unrelated to Dropps, capital calls, or urgent investment purposes.

18. In order to mollify Investor A, and in order to delay and prevent discovery by law enforcement of his own misconduct, on or about March 10, 2020, defendant JOSH S. VERNE sent an email to Investor A reconfirming that the purpose of the loan was for Dropps and promising that he would make good on the loan.

## THE WIRINGS

19.    On or about each of the dates set forth below, in the Eastern District of

Pennsylvania, and elsewhere, having devised and intending to devise this scheme, defendant

### JOSH S. VERNE,

for the purpose of executing the scheme described above, caused to be transmitted by means of

wire communication in interstate and foreign commerce the signals and sounds described below,

each transmission constituting a separate count:

| COUNT | APPROXIMATE DATE AND TIME | DESCRIPTION |
|---|---|---|
| 9 | January 15, 2020, at 7:04 p.m. | Internet transmission of email concerning Goldman Sachs statement from defendant JOSH S. VERNE through the Ownable server outside the Commonwealth of Pennsylvania, to Investor A via Campusapts.com in the Eastern District of Pennsylvania |
| 10 | March 10, 2020, at 9:05 a.m. | Internet transmission of email from defendant JOSH S. VERNE, through the Ownable server outside the Commonwealth of Pennsylvania, to Investor A via Campusapts.com inside the Eastern District of Pennsylvania |

All in violation of Title 18, United States Code, Section 1343.

22

## COUNT ELEVEN
### (Securities Fraud – Company C)

**THE GRAND JURY FURTHER CHARGES THAT:**

1.      Paragraphs 1 through 33 of Count One are incorporated here.

2.      Paragraphs 2 through 8 and 10 through 18 of Counts Nine and Ten are incorporated here.

3.      In or about early 2018, defendant JOSH S. VERNE became aware of an investment opportunity in a company ("Company C") that made credit-type cards available to college students and other persons with limited or impaired credit histories.

4.      On or about June 15, 2018, defendant JOSH S. VERNE executed a purchase agreement to purchase $1 million worth of units of Company C. In signing that agreement, defendant VERNE represented that the units he was to acquire in the name of KHV, LLC would be acquired for investment for his own account, not as a nominee or agent, and not with a view to the resale or distribution of any of the units to be acquired. Defendant VERNE also represented that he did not have any agreement or arrangement to sell, transfer, or grant participations to any other person with respect to the units to be acquired.

5.      Despite his public claims of great wealth, defendant JOSH S. VERNE did not in fact have enough money to fund the $1 million purchase of units of Company C that he had committed to buy.

6.      Because of the highly regulated industry in which it operated, Company C prohibited pooled investments. Thus, each investor had to assure Company C that he or she was investing exclusively for his or her own account, and not for other persons.

23

7.      Notwithstanding Company C's prohibition on pooled investments, between in or about June 2018 and in or about December 2018, defendant JOSH S. VERNE solicited friends, family members, and associates to contribute to a pool to be used to invest in Company C. This pool was called KHV Cred LLC (the "KHV-Cred Investment Pool"), and members of the pool became members of KHV Cred LLC, with an ownership interest in KHV-Cred's investment in Company C.

8.      Defendant JOSH S. VERNE collected a total of at least $1,500,000 from friends, family members, and other persons who wished to participate in his pooled investment in Company C. These funds were collected for the purpose of investing in Company C.

9.      On or about October 29, 2018, defendant JOSH S. VERNE caused a wire transfer of approximately $500,000 to be sent from KHV LLC's bank account to Company C pursuant to the purchase agreement that defendant VERNE had executed. The resulting units of Company C belonged to members of the KHV-Cred Investment Pool.

10.     On or about December 14, 2018, defendant JOSH S. VERNE caused a wire transfer of approximately $500,000 to be sent from KHV LLC's bank account to Company C pursuant to the purchase agreement that defendant VERNE had executed. The resulting units of Company C belonged to members of the KHV-Cred Investment Pool.

11.     Of the at least $1.5 million that defendant JOSH S. VERNE had collected from members of the KHV-Cred Investment Pool to be used to purchase Company C units, defendant VERNE used only approximately $1 million to purchase units in Company C. Defendant VERNE used the rest of the members' funds for improper personal and unrelated business purposes, such as travel on a private jet and payments to his creditors.

12. When the management of Company C learned that defendant JOSH S. VERNE was, in fact, not financially stable, and that defendant VERNE had in fact made a pooled investment despite Company C's requirements, and contrary to defendant VERNE's express representations to Company C, Company C told defendant VERNE that he would have to divest himself of his $1,000,000 investment.

13. On or about February 18, 2020, Company C agreed to re-purchase one-half of the units held by KHV Cred LLC in Company C for a payment of $500,000.

14. On or about March 11, 2020, Investor A, who was a founding member of Company C and its largest stockholder, agreed to purchase the remaining one-half of the units held by KHV Cred LLC in Company C in return for Investor A's forgiveness of $500,000 of the outstanding personal debt that defendant JOSH S. VERNE owed to Investor A.

15. Investor A agreed to accept these units of Company C in lieu of cash based on defendant JOSH S. VERNE's express representation that the units of Company C that were to be transferred belonged to defendant VERNE and that these units were defendant VERNE's to transfer. In the agreement of sale, defendant VERNE expressly represented in writing that he was the "record and sole beneficial owner" of the units of Company C being sold by him pursuant to the agreement, and that no third parties had any right, interest, or claim upon these units.

16. Company C paid $500,000 to defendant JOSH S. VERNE on or about February 18, 2020.

17. Investor A forgave $500,000 of defendant JOSH S. VERNE's outstanding personal debt on or about March 11, 2020.

18.     Although he had disposed of their stock in Company C, defendant JOSH S. VERNE did not, however, distribute the proceeds of these sales to the members of the KHV-Cred Investment Pool. Instead, defendant VERNE used these funds for his own personal purposes, such as payments to his creditors.

19.     Despite the fact that all of the Company C units had been disposed of by him, defendant JOSH S. VERNE continue to act as though the KHV-Cred Investment Pool still owned Company C units. On or about June 23, 2020, at 5:04 p.m., defendant VERNE wrote an email to Investor T assuring him that his investment in Company C was doing well.

20.     On or about July 15, 2020, defendant JOSH S. VERNE wrote a misleading email to the members of the KHV-Cred Investment Pool advising them that he was backing out of the investment in Company C because of a conflict of interest between Company C and Ownable. Defendant VERNE represented that the pooled funds were being returned in full by Company C and, despite the fact that he no longer had the money from the Company C units, promised that he would return the pool members' funds "quickly."

21.     In order to disguise the fact that he did not have the funds to repay the members of the KHV-Cred Investment Pool, and in order to delay and prevent discovery by law enforcement of his own misconduct, between on or about July 24, 2020, and on or about August 21, 2020, defendant JOSH S. VERNE sent a series of emails to members of the KHV-Cred Investment Pool falsely representing that he was making preparations to return their money; falsely claiming that members of the pool would receive 7% interest in addition to a return of their investment funds; falsely claiming that he had wired the funds due to the members of the KHV-Cred Investment Pool, but that the wires had failed due to bank procedures; and claiming

that he would be sending individual wires to each pool member along with an additional week of interest.

22.    On or about August 22, 2020, in order to disguise the fact that he did not have the funds to repay the members of the KHV-Cred Investment Pool, and in order to delay and prevent discovery by law enforcement of his own misconduct, defendant JOSH S. VERNE sent three emails to Investor C in which he purported to include bank emails confirming the wire transfer of funds into Investor C's bank account. Each of the purported bank emails were false and fraudulent.

23.    On or about August 26, 2020, in order to disguise the fact that he did not have the funds to repay the members of the KHV-Cred Investment Pool, and in order to delay and prevent discovery by law enforcement of his own misconduct, defendant JOSH S. VERNE sent an email to Investor C in which he purported to include a bank email confirming that a cashier's check had been sent by the bank to Investor C via FedEx. The purported bank email was false and fraudulent.

24.    On or about August 27, 2020, in order to delay and prevent discovery by law enforcement of his own misconduct, defendant JOSH S. VERNE sent an email to, among others, Investor M in which he falsely claimed that cashier's checks to the pool members were being sent by FedEx and were in route to defendant VERNE's home address. Defendant VERNE also emailed a document that falsely purported to be a FedEx delivery confirmation of that non-existent delivery.

25.    On or about August 27, 2020, in order to delay and prevent discovery by law enforcement of his own misconduct, defendant JOSH S. VERNE sent an email to Investors

27

M and J in which he falsely confirmed that he was expecting to receive their cashier's checks by FedEx that day by 8 p.m., and promised to advise them "once received."

26. On or about August 28, 2020, in order to disguise the fact that he did not have the funds to repay the members of the KHV-Cred Investment Pool, and in order to delay and prevent discovery by law enforcement of his own misconduct, defendant JOSH S. VERNE sent an email to Investor J, in which he reiterated that there was a bank-related problem and claimed that her money would be wired into her account that day or overnight.

27. On or about August 28, 2020, in order to delay and prevent discovery by law enforcement of his own misconduct, defendant JOSH S. VERNE sent emails to members of the KHV-Cred Investment Pool, in which he falsely claimed that the pool members' funds were being sent by FedEx and were in route to defendant VERNE's home address where, he said, someone was waiting to sign for it. Defendant VERNE also emailed a document that falsely purported to be a FedEx delivery confirmation of that non-existent delivery.

28. On or about August 29, 2020, in order to delay and prevent discovery by law enforcement of his own misconduct, defendant JOSH S. VERNE sent emails to members of the KHV-Cred Investment Pool, in which he promised that, notwithstanding his prior broken promises, "everyone will have 100% of their funds on Monday in their account."

29. Between on or about August 19, 2020, and on or about October 11, 2020, in order to delay and prevent discovery by law enforcement of his own misconduct, defendant JOSH S. VERNE sent text messages to Investor R in which he offered numerous false promises and reassurances about the imminent repayment of Investor R's funds, and numerous excuses when each of those promises and reassurances of payment failed to materialize.

28

30.    Between on or about August 25, 2020, and on or about October 16, 2020, in order to delay and prevent discovery by law enforcement of his own misconduct, defendant JOSH S. VERNE sent joint text messages to Investor R and Investor L in which he offered numerous false promises and reassurances about the repayment of Investor R's and Investor L's funds, and excuses when each of those promises and reassurances of payment failed to materialize.

31.    On or about September 21, 2020, at about 8:57 p.m., in order to delay and prevent discovery by law enforcement of his own misconduct, defendant JOSH S. VERNE sent an email to members of the KHV-Cred Investment Pool, in which he admitted that once the Company C units had been sold, "it would have been best if I had wired out money immediately afterward." Defendant VERNE admitted that he had not done so, claimed to have learned from this "painful lesson," and promised that he would "make this right" by paying each of the investors back "100% with interest," and personally guaranteeing the obligation. Defendant VERNE also promised that repayment would be made "quickly."

32.    On or about October 5, 2020, at about 4:38 a.m., in order to delay and prevent discovery by law enforcement of his own misconduct, defendant JOSH S. VERNE sent an email to members of the KHV-Cred Investment Pool, in which he again admitted that once the Company C units had been sold, it "would have been best if I had wired out money immediately afterward but that wasn't done." Defendant VERNE also admitted that his previous repayment promises had not been truthful. Defendant VERNE, however, insisted that he had "every intention to pay what is owed," and therefore enclosed a "revised note," signed by himself and his wife, purporting to personally guarantee the obligation.

29

33.     Defendant JOSH S. VERNE never repaid the members of the KHV-Cred Investment Pool.

34.     The ownership interests that defendant JOSH S. VERNE sold to the members of the KHV-Cred Investment Pool were securities within the meaning of the federal securities laws.

35.     The membership units in Company C that defendant JOSH S. VERNE acquired with funds obtained from the members of the KHV-Cred Investment Pool were securities within the meaning of the federal securities laws.

## THE SECURITIES FRAUD SCHEME

36.     From at least in or about June 2018, through at least in or about October 2020, in the Eastern District of Pennsylvania and elsewhere, defendant

## JOSH S. VERNE

unlawfully, willfully, and knowingly, directly and indirectly, by use of the means and instrumentalities of interstate commerce, used and employed, and aided and abetted the use and employment of, manipulative and deceptive devices and contrivances, in violation of Title 17, Code of Federal Regulations, Section 240.10b–5, by: (a) employing devices, schemes and artifices to defraud; (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices and courses of business which operated and would operate as a fraud and deceit upon any person, in connection with the purchase and sale of securities of KHV-Cred and Company C.

All in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b–5, and Title 18, United States Code, Section 2.

30

## COUNTS TWELVE THROUGH TWENTY
### (Wire Fraud – Company C)

**THE GRAND JURY FURTHER CHARGES THAT:**

1.      Paragraphs 1 through 33 of Count One are incorporated here.

2.      Paragraphs 2 through 8 and 10 through 18 of Counts Nine and Ten are incorporated here.

3.      Paragraphs 3 through 35 of Count Eleven are incorporated here.

### THE SCHEME TO DEFRAUD

4.      From in or about June 2018 through at least in or about October 2020, in Philadelphia, in the Eastern District of Pennsylvania and elsewhere, defendant

### JOSH S. VERNE

devised and intended to devise a scheme to defraud Investor A, Company C, and the members of the KHV-Cred Investment Pool, and to obtain money and property by means of false and fraudulent pretenses, representations, and promises.

### MANNER AND MEANS

It was part of the scheme that:

5.      Defendant JOSH S. VERNE subscribed to purchase $1,000,000 of units of Company C.

6.      Notwithstanding his representations that he would not do so, defendant JOSH S. VERNE raised funds to pay for Company C units by establishing and collecting funds for an investment pool (the KHV-Cred Investment Pool) to purchase Company C units.

7.      Defendant JOSH S. VERNE raised at least about $1.5 million from investors to purchase Company C units, but used only approximately $1 million of those funds

31

for that purpose, diverting the remaining funds to unauthorized purposes, including his own personal benefit.

8.    Defendant JOSH S. VERNE disposed of the Company C units that belonged to the KHV-Cred Investment Pool for valuable consideration, but did not return the funds that were due to the investors in the pool, instead using the resulting consideration for unauthorized purposes, including his own personal benefit.

9.    Defendant JOSH S. VERNE communicated with members of the KHV-Cred Investment Pool, offering them reassurances, promises, and guarantees, in order to delay and prevent discovery by law enforcement of his own misconduct.

## THE WIRINGS

10.    On or about each of the dates set forth below, in the Eastern District of Pennsylvania, and elsewhere, having devised and intending to devise this scheme, defendant

## JOSH S. VERNE,

for the purpose of executing the scheme described above, caused to be transmitted by means of wire communication in interstate and foreign commerce the signals and sounds described below, each transmission constituting a separate count:

| COUNT | APPROXIMATE DATE AND TIME | DESCRIPTION |
|---|---|---|
| 12 | June 23, 2020, at 5:04 p.m. | Internet transmission of email from defendant JOSH S. VERNE, in New Jersey, to Investor T in the Eastern District of Pennsylvania, assuring him that his investment in Company C was doing well |

32

| COUNT | APPROXIMATE DATE AND TIME | DESCRIPTION |
|---|---|---|
| 13 | July 15, 2020, at 7:31 p.m. | Internet transmission of email from defendant JOSH S. VERNE, in New Jersey, to the KHV-Cred Investment Pool members in, among other places, the Eastern District of Pennsylvania, advising them that he was backing out of the investment in Company C and that their capital would be returned in full |
| 14 | July 24, 2020, 4:48 p.m. | Internet transmission of email from defendant JOSH S. VERNE, through the Ownable server outside the Commonwealth of Pennsylvania, to the KHV-Cred Investment Pool members in, among other places, the Eastern District of Pennsylvania, advising them that the "document" would be sent to them shortly |
| 15 | August 26, 2020, at 9:33 p.m. | Internet transmission of email from defendant JOSH S. VERNE, in New Jersey, to Investor R and Investor L, in the Eastern District of Pennsylvania, purporting to enclose confirmation that cashier's checks had been sent via FedEx |
| 16 | August 27, 2020, at 7:35 a.m. | Internet transmission of email from defendant JOSH S. VERNE, in New Jersey, to Investor R, in the Eastern District of Pennsylvania, sending what purported to be a tracking number for Investor R's cashier's checks |
| 17 | August 27, 2020, at 8:22 a.m. | Internet transmission of email from defendant JOSH S. VERNE, in New Jersey, to Investor M, in the Eastern District of Pennsylvania, claiming that cashier's checks were being sent by FedEx |
| 18 | August 27, 2020, at 2:23 p.m. | Internet transmission of email from defendant JOSH S. VERNE, in New Jersey, to Investors M and J, in the Eastern District of Pennsylvania, confirming that cashier's checks were due to be delivered by FedEx that day by 8 p.m. |
| 19 | September 21, 2020, at 8:57 p.m. | Internet transmission of email from defendant JOSH S. VERNE, via Gmail, outside the Commonwealth of Pennsylvania, to the KHV-Cred Investment Pool members in, among other places, the Eastern District of Pennsylvania, promising prompt repayment |

| COUNT | APPROXIMATE DATE AND TIME | DESCRIPTION |
|---|---|---|
| 20 | October 5, 2020, at 4:38 a.m. | Internet transmission of email from defendant JOSH S. VERNE, through the Ownable server outside the Commonwealth of Pennsylvania, to the KHV-Cred Investment Pool members in, among other places, the Eastern District of Pennsylvania promising that he had "every intention to pay what is owed," and enclosing a "revised note" |

All in violation of Title 18, United States Code, Section 1343.

## COUNT TWENTY-ONE
### (Securities Fraud – Company B)

**THE GRAND JURY FURTHER CHARGES THAT:**

1.  Paragraphs 1 through 33 of Count One are incorporated here.

2.  Paragraphs 2 through 8 and 10 through 18 of Counts Nine and Ten are incorporated here.

3.  In or before about July 2017, defendant JOSH S. VERNE became aware of an investment opportunity in Company B, a company that supplied boxed alcoholic beverages.

4.  Despite his public claims of great wealth, defendant JOSH S. VERNE did not in fact have enough money to make a substantial investment in Company B.

5.  In order to raise investment capital, defendant JOSH S. VERNE solicited friends, family members, and associates to contribute to a pool to be used to invest in Company B. This pool was called BBB Investments LLC ("BBB-I"), and members of the pool (the "BBB-I Investment Pool") became members of BBB-I, with an ownership interest in BBB-I's investment in Company B.

6.  Defendant JOSH S. VERNE collected a total of approximately $2.3 million from friends, family members, and other persons who wished to participate in his pooled investment in Company B. These funds were collected for the purpose of investing in Company B. Defendant VERNE used only approximately $1.9 million of these funds to purchase units in Company B. Defendant VERNE diverted the rest of the funds to his own personal purposes.

7.  The units of Company B purchased by defendant JOSH S. VERNE belonged to members of the BBB-I Investment Pool. Defendant VERNE contributed no money to BBB-I. Instead, the units purchased in the name of BBB-I belonged to the friends, family

35

members, and associates whom defendant VERNE convinced to give him money for the purpose of investing in the pool to purchase Company B units.

8.     On or about March 14, 2020, defendant JOSH S. VERNE agreed to transfer to Investor A certain units of Company B in return for Investor A's forgiveness of approximately $350,000 of the outstanding personal debt that defendant VERNE owed to Investor A. Investor A agreed to accept these units in lieu of cash based on defendant VERNE's express representation that the units of Company B that were to be transferred belonged to defendant VERNE and that these units were defendant VERNE's to transfer. In the agreement of sale, defendant VERNE expressly represented in writing that he "own[ed] all right, title and interest (legal and beneficial) in and to all of the units being sold" by him pursuant to the agreement, and that no third parties had any right, interest, or claim upon these units.

9.     On or about April 1, 2020, defendant JOSH S. VERNE agreed to transfer to Investor A certain additional units of Company B in return for Investor A's payment of approximately $200,000 in debts that defendant VERNE personally owed to third persons and a payment of approximately $23,828 to defendant VERNE. Investor A agreed to purchase these units based on defendant VERNE's express representation that the units of Company B that were to be transferred belonged to defendant VERNE and that these units were defendant VERNE's to transfer. Indeed, in the agreement of sale, defendant VERNE expressly represented in writing that he "own[ed] all right. title and interest (legal and beneficial) in and to all of the units being sold" by him pursuant to the agreement, and that no third parties had any right, interest, or claim upon these units.

10.    In fact, defendant JOSH S. VERNE did not personally own any units of Company B. Instead, the Company B units that defendant VERNE sold to Investor A belonged to the members of the BBB-I Investment Pool.

11.    Although defendant JOSH S. VERNE had disposed of Company B units belonging to the members of the BBB-I Investment Pool in or about March 2020 and in or about April 2020, defendant VERNE did not distribute the proceeds of these sales to the members of the BBB-I Investment Pool. Instead, defendant VERNE used these funds for his own personal purposes.

12.    On or about January 5, 2021, at about 8:39 a.m., in order to delay and prevent discovery by law enforcement of his own misconduct, defendant JOSH S. VERNE sent an email to Investor KZ, in which defendant VERNE claimed that his sale of Company B units to Investor A was inadvertent.

13.    Defendant JOSH S. VERNE never repaid the members of the BBB-I Investment Pool.

14.    The membership units that defendant JOSH S. VERNE sold to the members of the BBB-I Investment Pool were securities within the meaning of the federal securities laws.

15.    The membership units in Company B that defendant JOSH S. VERNE acquired with funds obtained from the members of the BBB-I Investment Pool were securities within the meaning of the federal securities laws.

## THE SECURITIES FRAUD SCHEME

16.    From at least in or about July 2017 through at least in or about December 2020, in the Eastern District of Pennsylvania and elsewhere, defendant

**JOSH S. VERNE**

unlawfully, willfully, and knowingly, directly and indirectly, by use of the means and instrumentalities of interstate commerce, used and employed, and aided and abetted the use and employment of, manipulative and deceptive devices and contrivances, in violation of Title 17, Code of Federal Regulations, Section 240.10b–5, by: (a) employing devices, schemes and artifices to defraud; (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices and courses of business which operated and would operate as a fraud and deceit upon any person, in connection with the purchase and sale of securities of Company B and BBB-I.

All in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b–5, and Title 18, United States Code, Section 2.

38

## COUNTS TWENTY-TWO THROUGH TWENTY-SIX
### (Wire Fraud – Company B)

**THE GRAND JURY FURTHER CHARGES THAT:**

1.      Paragraphs 1 through 33 of Count One are incorporated here.

2.      Paragraphs 2 through 8 and 10 through 18 of Counts Nine and Ten are incorporated here.

3.      Paragraphs 3 through 15 of Count Twenty-One are incorporated here.

### THE SCHEME TO DEFRAUD

4.      From at least in or about July 2017 through at least in or about December 17, 2020, in Philadelphia, in the Eastern District of Pennsylvania and elsewhere, defendant

### JOSH S. VERNE

devised and intended to devise a scheme to defraud Investor A and the members of the BBB-I Investment Pool, and to obtain money and property by means of false and fraudulent pretenses, representations, and promises.

### MANNER AND MEANS

It was part of the scheme that:

5.      Defendant JOSH S. VERNE subscribed to purchase units of Company B.

6.      Defendant JOSH S. VERNE raised approximately $2.3 million from investors to purchase Company B units, but used only approximately $1.9 million of these funds for this purpose, diverting the remaining funds to unauthorized purposes, including his own personal benefit.

7.      Defendant JOSH S. VERNE disposed of the Company B units that belonged to the BBB-I Investment Pool for valuable consideration, but did not return the funds

39

that were due to the investors in the pool, instead using the resulting consideration for unauthorized purposes, including his own personal benefit.

8.    Defendant JOSH S. VERNE communicated with members of the BBB-I Investment Pool, offering them reassurances, promises, and guarantees, in order to delay and prevent discovery by law enforcement of his own misconduct.

## THE WIRINGS

9.    On or about each of the dates set forth below, in the Eastern District of Pennsylvania, and elsewhere, having devised and intending to devise this scheme, defendant

## JOSH S. VERNE,

for the purpose of executing the scheme described above, caused to be transmitted by means of wire communication in interstate and foreign commerce the signals and sounds described below, each transmission constituting a separate count:

| COUNT | APPROXIMATE DATE (AND TIME) | DESCRIPTION |
|---|---|---|
| 22 | December 2, 2019 | Wire transfer from Republic Bank in the Eastern District of Pennsylvania to TD Bank in Canada of Investor KZ's approximately $200,000 for Company B |
| 23 | December 2, 2019 | Wire transfer of approximately $100,000 of Investor KZ's funds by defendant JOSH S. VERNE in the Commonwealth of Pennsylvania through TD Bank in Canada to Company B |
| 24 | December 2, 2019 | Wire transfer of approximately $90,000 of Investor KZ's funds by defendant JOSH S. VERNE in the Commonwealth of Pennsylvania through TD Bank in Canada to Company B |
| 25 | March 13, 2020 | Email from counsel for Company B to defendant JOSH S. VERNE in the Eastern District of Pennsylvania through the Ownable server outside the Commonwealth of Pennsylvania, concerning transfer of shares |

| COUNT | APPROXIMATE DATE (AND TIME) | DESCRIPTION |
|---|---|---|
| 26 | November 30, 2020, at 11:07 a.m. | Text message exchange between defendant JOSH S. VERNE, in the Commonwealth of Pennsylvania, and Investor KR, in the state of New Jersey, in which VERNE offered reassurances about the Company B transaction |

All in violation of Title 18, United States Code, Section 1343.

### COUNT TWENTY-SEVEN
#### (Witness Retaliation)

**THE GRAND JURY FURTHER CHARGES THAT:**

1. Paragraphs 1 through 33 of Count One are incorporated here.

2. Paragraphs 2 through 10 and 12 through 19 of Counts Four through Seven are incorporated here.

3. On or about September 12, 2022, defendant JOSH S. VERNE attended by telephone an in-person meeting between his attorneys and representatives of the government to discuss the expected federal criminal prosecution of defendant VERNE. During this meeting, an FBI Special Agent detailed some of the government's evidence against defendant VERNE, including defendant VERNE's forgery of Employee 1's name and defendant VERNE's theft of the proceeds of the sale of Employee 1's stock.

4. Minutes after the conclusion of the meeting, defendant JOSH S. VERNE contacted Employee 1 by text message and told him that he had just gotten off the phone with the "appropriate people" to whom Employee 1 had spoken. Employee 1 did not respond to defendant VERNE's text message.

5. Less than two hours later, defendant JOSH S. VERNE sent Employee 1 another text message in which defendant VERNE threatened to divulge embarrassing information, about events that in fact had never actually happened, "[i]f this goes forward."

6. Later that night, defendant JOSH S. VERNE sent a text message to Employee 1's wife in which defendant VERNE told her that, because Employee 1 had spoken to the "authorities" about him, Employee 1's spouse would "be brought into the conversation."

7.    On or about September 12, 2022, in the Eastern District of Pennsylvania and elsewhere, defendant

**JOSH S. VERNE**

knowingly, with the intent to retaliate against Employee 1, took actions harmful to Employee 1 and Employee 1's wife, for providing to a law enforcement officer truthful information relating to the commission and possible commission of federal offenses.

In violation of Title 18, United States Code, Section 1513(e).

## COUNT TWENTY-EIGHT
### (Witness Intimidation)

**THE GRAND JURY FURTHER CHARGES THAT:**

1.    Paragraphs 1 through 33 of Count One are incorporated here.

2.    Paragraphs 2 through 10 and 12 through 19 of Counts Four through Seven are incorporated here.

3.    Paragraphs 3 through 6 of Count Twenty-Seven are incorporated here.

4.    On or about September 12, 2022, in the Eastern District of Pennsylvania and elsewhere, defendant

### JOSH S. VERNE

knowingly used intimidation, threatened, and corruptly persuaded, and attempted to use intimidation, threaten, and corruptly persuade Employee 1 and Employee 1's wife, and engaged in misleading conduct toward Employee 1 and Employee 1's wife, with the intent to influence, delay, and prevent the testimony of Employee 1 in an official proceeding, that is, a federal grand jury sitting in the Eastern District of Pennsylvania.

In violation of Title 18, United States Code, Section 1512(b)(1).

## NOTICE OF FORFEITURE

**THE GRAND JURY FURTHER CHARGES THAT:**

1. As a result of the violations of Title 18, United States Code, Section 1343, and Title 15, United States Code, Section 78ff, defendant

**JOSH S. VERNE**

shall forfeit to the United States of America any property which constitutes or is derived from proceeds traceable to the commission of such offenses, including, but not limited to the sum of $14,200,000.00.

2. If any of the property subject to forfeiture, as a result of any act or omission of the defendant:

    a. cannot be located upon the exercise of due diligence;

    b. has been transferred or sold to, or deposited with, a third party;

    c. has been placed beyond the jurisdiction of this Court;

    d. has been substantially diminished in value; or

    e. has been commingled with other property which cannot be divided without difficulty;

it is the intention of the United States, pursuant to Title 28, United States Code, Section 2461(c), incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendant up to the value of the property subject to forfeiture.

All pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461.

A TRUE BILL:

GRAND JURY FOREPERSON

JACQUELINE C. ROMERO
UNITED STATES ATTORNEY

No._ _ _ _ _ _ _ _ _ _

**UNITED STATES DISTRICT COURT**

Eastern District of Pennsylvania

<u>Criminal Division</u>

THE UNITED STATES OF AMERICA

v.

JOSH S. VERNE

INDICTMENT

Counts
**15 U.S.C. §§ 78j(b) & 78ff and 17 C.F.R. § 240.10b–5 (securities fraud – 3 counts)**
**18 U.S.C. §§ 1343, 1349 (wire fraud - 22 counts)**
**18 U.S.C. § 1028A (aggravated identity theft – 1 count)**
**18 U.S.C. § 1513(e) (witness retaliation – 1 count)**
**18 U.S.C. § 1512(b)(1) (witness intimidation and attempted witness intimidation – 1 count)**
**18 U.S.C. § 2 (aiding and abetting)**
**Notice of forfeiture**



Filed in op⬛⬛⬛⬛⬛day,
Of _⬛⬛⬛⬛⬛⬛

Bail, $_____