**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| | : | |
| **v.** | : | **CRIMINAL NUMBER 24-270** |
| | : | |
| | : | |
| **JOSH S. VERNE** | : | |

<u>**JOSH VERNE'S SENTENCING MEMORANDUM**</u>

Josh S. Verne, by and through his undersigned counsel, Michael B. McCrossen and

Angela Levy, Assistant Federal Defenders, Federal Community Defender Office for the Eastern

District of Pennsylvania, hereby submits this sentencing memorandum in anticipation of his

Sentencing Hearing, scheduled for March 4, 2026. For all the reasons set forth more fully below,

Mr. Verne respectfully asserts that a significant downward variance will reflect the minimally

sufficient sentence that will accomplish the goals of sentencing as set forth at 18 U.S.C. §

3553(a). For multiple reasons, the advisory guidelines range vastly overstates Mr. Verne's

culpability and is contrary to the goals of sentencing.

**I.      INTRODUCTION AND BACKGROUND**

On March 3, 2025, pursuant to a Guilty Plea Agreement, Mr. Verne pled guilty to three

counts of securities fraud in violation of 15 U.S.C. § 78j(b) and 78ff(a)(2) and 17 C.F.R.

240.10b-5, nine counts of wire fraud in violation of 18 U.S.C. § 1343, and one count of

aggravated identity theft in violation of 18 U.S.C. § 1028A(a) and (c)(5). In so doing, Mr. Verne

accepted responsibility for his wrongdoing and spared the government and Court significant

time, expense, and resources of a lengthy and complex trial.

Mr. Verne respectfully asserts that he is entitled to a significant downward variance from the advisory sentencing guidelines range for several reasons, including his personal history and characteristics and a fraud loss guideline that inappropriately overstates his culpability.

## II.    PERSONAL HISTORY AND CHARACTERISTICS

At first blush, Mr. Verne appears to have enjoyed a privileged and comfortable upbringing. The reality, however, was that Mr. Verne was raised in a household mired in dysfunction. To understand how it is that he stands before the Court convicted of defrauding numerous victims, it is necessary to understand how he became the complex human that he is. Psychologist Dr. Ted Cunliffe met with and evaluated Mr. Verne over five sessions in June and July of 2025. He conducted a comprehensive psychological evaluation of Mr. Verne and prepared a Forensic Mental Health Assessment Report. A full copy of the report is attached hereto as Exhibit A[1].

Mr. Verne was raised in the suburbs of Philadelphia in a household where his father was often absent, working long hours and running his family's furniture business. *See* Final Presentence Report ("PSR") at ¶ 79. Despite the fact that his mother did not work outside the home, Mr. Verne was partly raised by Rosie, his family's housekeeper. *See* PSR at ¶ 82. Mr. Verne was aware that his father was frequently unfaithful to his mother, and he watched and listened as his father lied to his mother. *See* Exhibit A, p. 3. In his home, Mr. Verne was discouraged from discussing his problems, and he felt "severe pressure to succeed." *Id.* In hindsight, Mr. Verne understands that his parents' priority was to create an impression of a close, "perfect" family and to maintain a certain reputation regardless of reality. *See id.*

---

[1] Mr. Verne requests that Exhibit A be filed under seal.

His family did not place great emphasis on schooling and education; as such, Mr. Verne was focused on merely finishing school so that he could begin working. *Id.* at p. 5. When he graduated from high school is 1995, he did not go to college; instead, he immediately began working for his family's furniture company.  He was president of that company from 1998 to 2011. When the business failed, his family blamed him and he experienced a tremendous amount of shame. *Id.* As is detailed in the PSR and Exhibit A, much of Mr. Verne's identity is tied to his desire to be a successful businessman.

A.  Mr. Verne's Diagnoses

After evaluating Mr. Verne, Dr. Cunliffe concluded that he suffers from "co-morbid diagnoses of alcohol use disorder in early (partial) remission, and severe histrionic and obsessive-compulsive personality disorders." Exhibit A, p. 6. Although Mr. Verne denied experiencing trauma, Dr. Cunliffe noted that the psychological testing indicated the presence of trauma. *Id.* Dr. Cunliffe further opined

> Although he was mildly anxious, moderately depressed, guarded, and hypervigilant (scanning his surroundings) throughout the assessment, the chief etiology of his problems was related to his severe character pathology rather than major depressive disorder or an anxiety disorder. The testing revealed that his dysphoric affect, extremely rigid thinking, reactive mood, feeling uncomfortable when he is not the center of attention, rapidly shifting and shallow expression of emotions, impressionistic speech, view of personal relations more intimate than they actually are, need for perfectionism, preoccupation by orderliness, reluctance to delegate tasks, and rigidity and stubbornness were deemed to be directly caused by his severe personality pathology (histrionic and obsessive-compulsive personality disorders). In the professional opinion of the writer, the interviews and testing strongly suggested that the likelihood of attention deficit hyperactivity disorder, obsessive-compulsive, and bipolar illness are very low.

*Id.* at pp. 6-7. This is significant because prior to Dr. Cunliffe's evaluation and analysis, Mr. Verne was under the impression that he suffered from obsessive compulsive disorder ("OCD")

3

and attention deficit hyperactivity disorder ("ADHD"). *See* PSR at ¶¶ 94-97. In fact, since childhood and early adulthood, Mr. Verne has only ever been diagnosed with OCD and ADHD. More importantly, during all relevant time periods, he had only ever been treated for those conditions.

Following several clinical evaluation sessions, psychological testing, and review of relevant records, Dr. Cunliffe diagnosed Mr. Verne with "Histrionic Personality Disorder, Severe, Obsessive-Compulsive Personality Disorder, Severe, Other Specified Trauma and Stressor-Related Disorder (persistent response to trauma with PTSD-like symptoms which fall short of a PTSD diagnosis), Alcohol Use Disorder, Severe, in early (partial) remission, and Problems Related to Other Legal Circumstances." Exhibit A, p. 20. Moreover, Dr. Cunliffe concluded that Mr. Verne suffers from

> severe problems thinking clearly and accurately, poor coping and resilience (inability to adapt to adversity or situations involving stress), poor problem-solving and extremely limited insight and psychological mindedness. The essence of his difficulties functioning is centered on the confluence of his co-morbid severe histrionic and obsessive-compulsive personality disorders and alcoholism. Although the results of the assessment did not indicate a diagnosis of posttraumatic stress disorder, the evaluation revealed significant trauma symptoms and self-harming behavior which are further impairing his preexisting difficulties with a pathological need for attention, preoccupation with minor or unimportant details, inability to think clearly, extremely rigid thinking and difficulties appreciating and understanding the interests and motivations of other people around him. Although the results of the assessment did not indicate that he was attempting to feign or exaggerate the extent of his problems for secondary gain (no evidence of feigning to escape prosecution, for example), his severe lack of insight, poor psychological mindedness, and shallow or underdeveloped emotional relations (limited ability to fully understand, appreciate, and manage emotions, and to understand

> and respond to the emotions of others in a genuine way) were
> extremely low in spite of average to high average intelligence.

*Id.*

Dr. Cunliffe assessed Mr. Verne's abilities regarding judgment and observed that his

"ability to think on his feet during crisis situations appeared to be poor based upon his responses

to several real-life problem-solving scenarios. Additionally, more in depth tests of his judgment

revealed severe problems with perspective taking, insight, and perceiving the world around him

accurately." *Id.* at p. 8. Regarding judgment, Dr. Cunliffe elaborates as follows:

> This type of discrepancy in measures of judgment is common
> among people diagnosed with severe personality disorders and gets
> to the heart of his condition. That is, individuals with similar
> profiles to Mr. Verne can respond appropriately to structured
> exercises in which they are not the central actor or appear normal
> in many respects but when they discuss themselves in relation to
> others, their severe problems with judgment are evident. They
> often might seem rational to an untrained eye but when a
> conversation touches upon an illogical belief, severe judgment
> problems and paranoid statements emerge. This is the case with
> Mr. Verne. The results of the evaluation as a whole demonstrated
> the severe difficulties, he experiences with perspective taking,
> appraisals of his social milieu, appreciation of consequences,
> judgment, and tendency to react impulsively without carefully
> considering outcomes.

*Id.* at p. 9.

Mr. Verne does not offer Dr. Cunliffe's observations and conclusions to excuse his

conduct; rather, he seeks to elucidate and offer expert explanation for criminal conduct that is not

nearly as straightforward as the government presents it.

B. Mr. Verne's Untreated Conditions Directly Contributed to His Criminal Conduct.

Mr. Verne has not been in denial about the fact that he suffers from mental health

conditions, nor has he been resistant to treatment. In fact, to the contrary, he has been

exceedingly open about his mental health struggles and has sought – and complied with –

treatment for previously diagnosed conditions. The problem, as addressed briefly above, is that

he was likely misdiagnosed. From childhood, he has been told that he suffers from ADHD. In

early adulthood, he was told that he has OCD. Dr. Cunliffe disagrees with both of these

diagnoses and explains that he comes to his conclusions after conducting extensive psychological

testing. *See* Exhibit A, at pp. 6-7, 23-34.

Dr. Cunliffe opines that

> [i]n the case of Mr. Verne, his difficulties lie in the nexus between several related but distinct conditions: 1) severe histrionic personality disorder, 2) severe obsessive-compulsive personality disorder, 3) ill-defined trauma symptoms, and 4) severe alcoholism. It is suggested that these conditions are linked, not parallel. That is, it appears that Mr. Verne's longstanding poor personality functioning was exacerbated by long history of severe alcoholism. <u>It is suggested that his problems thinking clearly, severe need for attention and approval from others, need to please, lack of insight, and very poor judgment arising from these conditions played a central role in his criminal behavior which led to his arrest.</u>

*Id.* at p. 20 (emphasis added). Dr. Cunliffe further explains, in detail, the characteristics of

histrionic personality disorder and obsessive-compulsive personality disorder. *See id.* at pp. 21-

22. Examination of Mr. Verne's interactions with investors and employees in the latter period of

Ownable's existence – specifically in 2020 – reveals that markers of each of these personality

disorders is on full display. Compounding his personality disorders, Mr. Verne has struggled

with alcohol dependence for many years. *See id.* at p. 23. As it was becoming clear that Ownable

was not going to be successful, Mr. Verne increased his alcohol consumption, which, he submits,

further exacerbated the effects of his untreated personality disorders.

Dr. Cunliffe concluded as such:

> The confluence of Mr. Verne's extremely rigid thinking, severe problem-solving deficits, fluctuating emotions, need for attention, and lack of insight severely impacted his thinking and behavior leading up to his arrest (2018 to 2024). When asked why he had

engaged in the offenses, he commented, "I was just trying to save the company and all the people who worked there, so many people were counting on me." However, his appreciation of the likely consequences of his behavior and how it might be received by others seemed to be extremely low. Additionally, his comments during the interview suggested that his poor ability to anticipate the consequences of his actions was due to her severe lack of insight, very rigid thinking, impulsive decision making, and limited problem solving brought about by his personality disorders and exacerbated by his alcoholism. The fact that Mr. Verne does not have a history of criminal behavior apart from a DUI arrest in 1998 and there was very limited evidence to suggest antisocial or criminal thinking in the interview and testing, indicates a low likelihood of being involved in criminal activities under normal circumstances. However, it is suggested that when considered under the lens of his severe personality disorders, it is probable that his involvement was directly related to his personality pathology, as evidenced by his intense need for attention and approval from others, very rigid and ineffective thinking and poor problem-solving abilities, lack of insight, and failure to appreciate the consequences of his behavior.

*Id.* at p. 23.

The treatment for personality disorders is different than treatment for OCD and/or ADHD. The good news is that Mr. Verne's disorders are treatable. Dr. Cunliffe sets forth his detailed treatment recommendations at page 24. Given Mr. Verne's demonstrated commitment to seeking and complying with treatment, the Court can have confidence that he will follow through and comply with recommendations based on a more accurate picture of his mental health. Moreover, his age, lack of criminal history, and positive characteristics all suggest that Mr. Verne is at a low risk of reoffending.

C.  Mr. Verne's Positive Characteristics

Those who know him best – and those who have known him longest – describe a very different person than the criminal defendant who pled guilty to defrauding investors. Mr. Verne urges the Court to consider the totality of his 48 years, not just the time period in which he committed fraud. First and foremost, Mr. Verne absolutely intended for Ownable to become a

7

successful, profitable enterprise. He desired nothing more than to make his father proud, uphold a strong reputation in his community, and build a successful start-up. He believed in the business model. He consulted with and co-created Ownable with a prominent Philadelphia businessman. He, and others, legitimized the business through documentation and registration, the creation of a board, and inventory acquisition. He invested his own resources and assets into Ownable. Josh Verne put his heart and soul into making Ownable work.

Attached at Exhibit B are character letters from family, friends, community members, and former colleagues. Read as a whole, the letters reflect that Mr. Verne was respected, he is hard working and well meaning, his potential is enormous, and that his criminal conduct is not reflective of his true character. The letters also demonstrate that Mr. Verne is remorseful, committed to growth and progress, and he has not minimized his conduct to his friends, family, and community.

Mr. Verne is a devoted father. His daughters write eloquently about their father. *See* Exhibits B-1 and B-2. The pain they have suffered as a family is evident; but what is also evident is Mr. Verne's commitment to accountability and rebuilding his daughters' trust in him.

Several people who have known Mr. Verne for years express how hard it is to reconcile the person they know with his criminal conduct. For example,

> When I found out what happened with this legal case, I couldn't wrap my head around it. It just didn't add up to the Josh I know. To me, he's always been someone who puts his energy into helping, fixing, and making people feel cared about…certainly not the opposite. I know he's not perfect, nobody is, but what I do know is he feels this deep in his soul. You can hear it in his voice, you can see it in how heavy he carries it…especially for when he hears if people question if he has remorse for what happened.

> What stands out most to me about Josh is that he never gives up on people. He didn't give up on me when I was going through hard times, and I don't believe he's going to give up on himself now either. I think that says everything about who he is.

*See* Exhibit B-7.

> That's why hearing about the legal issues he's going through now is so surprising to me. It doesn't match the Josh I knew then or the Josh I spoke with more recently. He's always been passionate. When he sets his mind to something, he throws himself into it completely. Sometimes maybe too much. But at his core, he is driven, loyal, and cares about the people around him.

*See* Exhibit B-9.

> When I heard what happened to Josh, I was shocked. My first thought was, "this can't be true." The Josh I know is someone who always puts others first. If there was a mistake, I believe it was something that just happened in the moment, not who he really is. Knowing him, I am sure he already looked deep inside, feels real remorse, and will do everything he can to make it right.

*See* Exhibit B-10.

Reading the letters as a whole, it is clear that many people know Josh Verne as someone who is deeply engaged with other people and jumps in to help others without question or hesitation.

> I first met Josh in 2008, during one of the most difficult times of my life. I was in dire financial straits, a single parent with a young child, and struggling to find the right opportunity. Josh, then one of the owners of Home Line Furniture, extended an employment opportunity to me when no one else would. That opportunity not only provided me with financial stability but truly changed the trajectory of my life. His willingness to give me a chance when I needed it most is something I will never forget, and it speaks to the generosity and compassion he has consistently shown toward others.
>
> There are countless examples of Josh's kindness, but one moment stands out in particular. Some time later, after going to work for his company, on a day I was scheduled to move, my movers left me stranded. With no hesitation, Josh sent a truck and movers to help me relocate to my new place. It wasn't his responsibility, and he asked for nothing in return. He simply stepped in when he saw I was in need. That is the man I know—someone who acts out of kindness, humility, and a genuine concern for others. He has never once mentioned that day to me in all these years, but I will never forget.

9

*See* B-11.

Perhaps most importantly, the letters attached at Exhibit B demonstrate Mr. Verne's remorse.

> I know what remorse looks like and I have seen it every time we meet or speak. In my heart and mind, I know it is real. He does not need to prove himself to me. He has spoken often about the people that he hurt and how he wishes he could take it back and make it right.

*See* Exhibit B-12.

> When I first met Josh, I saw a man who was carrying the weight of remorse and regret. But I also saw someone who wanted to change — to reconnect with what was meaningful in his life and to rebuild himself from the inside out. Over time, I've gotten to know Josh personally, not just through conversation but by watching his actions and the consistency of his effort.

*See* Exhibit B-16.

> While I know that Mr. Verne has made some bad decisions, I do know at his core, he is a good person. I have spoken with Mr. Verne several times over the last 2 years, and it is evident to me that he has taken accountability and has recognized the mistakes he made and people he hurt.

*See* Exhibit B-19.

> I worked for Josh for 15 years and still talk to him a lot. To say he feels bad about all this is not even close, it's way more. The Josh they talk about and what they say he did, that's not the Josh I know.

*See* Exhibit B-20.

When Mr. Verne was charged and arrested, he was told not to contact any victims and given a list of people he could not have contact with. Mr. Verne's defense team reached out to some of the people on that list. Despite being identified as victims of his fraud, two individuals submitted letters on Mr. Verne's behalf and they are attached at Exhibit C. One former colleague writes, in part,

> During the time I worked alongside Josh, I came to know him as a dedicated, thoughtful, and capable professional. In our day-to-day work, he consistently demonstrated reliability, sound judgment, and respect for others, and he approached his responsibilities with seriousness and care. Outside of work I observed him to be a dedicated father and husband who values his relationships with family and friends. Josh is a very generous and giving individual who would always extend himself to others.

*See* Exhibit C-2.

As one of his daughters writes, Mr. Verne has "a warmth about him that inspires everyone around him to be better. He is passionate, kind, and deeply caring." Exhibit B-1. She has "[ ] seen how [he] has worked to change and heal from his own pain." *Id.* Mr. Verne respectfully asks the Court to hold this description in mind when considering the victim impact statements and in fashioning the minimally sufficient sentence.

### III.    SENTENCING ARGUMENT

As correctly stated in the PSR, the base offense level for Mr. Verne's offense is 7. PSR ¶ 60. While Mr. Verne and the government disagree about the total loss amount, both parties agree the loss attributable to Mr. Verne is between $9.5 million and $25 million. Accordingly, his offense level was increased by 20, pursuant to U.S.S.G. § 2B1.1(b)(1)(K). PSR ¶ 61.  Two more levels are added, pursuant to U.S.S.G. § 3C1.1, for Mr. Verne's purported obstruction of justice. PSR ¶ 66.  The offense level is reduced by three for Mr. Verne's timely decision to plead guilty and accept full responsibility for his actions. PSR. ¶ 68-69. It is further reduced by two levels because Mr. Verne is a "zero point offender." PSR ¶ 70. The resulting total offense level is 28. PSR ¶ 71. Based on his complete absence of any criminal history, Mr. Verne's criminal history category is I. PSR ¶ 74.  Mr. Verne's conviction in count 8 of the indictment, for a violation of 18 U.S.C. § 1028A(b)(2), requires the imposition of twenty-four month mandatory period of incarceration consecutive to any other sentence imposed. Thus, the effective guideline range of

11

imprisonment as calculated in the Presentence Report, is 102 to 121 months. PSR ¶ 117.

Mr. Verne submits the fraud loss guideline, U.S.S.G. 2B1.1(b)(1) inappropriately overstates Mr. Verne's culpability. Additionally, Mr. Verne objects to the imposition of an increase for obstruction of justice, pursuant to U.S.S.G. 3C1.1. Both points will be discussed in turn.

### A.  The Severity of the Fraud Loss Guideline

The advisory guideline ranges generated by § 2B1.1 are driven primarily by the loss amount attributed to defendant.  In its current iteration, the offense level "enhancements" included in the "loss table" in § 2B1.1 have an outsized impact on a defendant's advisory guideline imprisonment range, often resulting in draconian terms of imprisonment that are not reflective of the defendant's true culpability.  To some degree, these harsh outcomes are intentional. The loss table was designed and has been amended to tie the severity of sentences to the amount of the loss. As the Guidelines explain, "the Commission has determined that, ordinarily, the sentences of defendants convicted of federal offenses should reflect the nature and magnitude of the loss caused or intended by their crimes." [2] However, the use of fraud loss amount as a proxy for culpability "routinely recommends arbitrary, disproportionate, and often draconian sentences to first-time offenders of economic crimes." [3] As currently constructed, a first-time offender can see his or her advisory range of imprisonment increase from range of 0-6 months to 210-262 months based *solely* on the amount of loss.[4]

---

[2] U.S.S.G. §2B1.1, comment. (background)
[3] Barry Boss & Kara Kapp, How the Economic Loss Guideline Lost Its Way, and How to Save It, 18 Ohio St. J. Crim. L. 605, 605–06 (2021)

[4] See U.S.S.G. §2B2.1 AND U.S.S.G. Chapter 5, Part A- Sentencing Table. A defendant with no criminal history and a base offense level of 7, as is the case here, starts with an advisory range of 0-6 months. The highest enhancement on the loss table adds 30 levels, resulting in an advisory range of over 20 years, near the bottom of the table.

The fraud guidelines were not always this severe, but have been flawed from the start. When the Sentencing Commission drafted the initial fraud and theft guidelines, it did not employ the empirical approach it claimed to use for other guidelines, and based on prior sentencing practices.[5] The economic offense guidelines were specifically written to reduce the availability of probation and to "ensure a short but definite period of confinement for a larger percentage of these 'white collar' cases".[6] To achieve this objective, the Sentencing Commission excluded from its analysis the fifty percent of the data comprised of *every case* in which a judge imposed a sentence of probation.[7] Even after this exclusion of data, the Sentencing Commission opted to recommend sentences harsher than the average terms of imprisonment reflected by the remaining half of data. [8]

Even based on flawed methodology, untethered from empirical analysis, the fraud guidelines were a far cry from their present hyper-punitive state. In 1987, the year the first Sentencing Guidelines Manual was published, §2F1.1, "Fraud and Deceit", provided for a base offense level of 6 and a maximum of 11 potential increases based on fraud loss amount:

---

[5] See USSC, Fifteen Years of Guidelines Sentencing: An Assessment of How Well the Federal Criminal Justice System is Achieving the Goals of Sentencing Reform vii, 15 (2004) (Hereinafter "Fifteen Year Review") (discussing empirical approach used in overall Guideline formation)

[6] *Id.*

[7] Boss and Kapp, *supra* note 2, at 609. *See also,* Stephen Breyer, The Federal Sentencing Guidelines and the Key Compromises Upon Which They Rest, 17 Hofstra L. Rev. 1, 20–22 (1988).

[8] *Id.,* citing from Mark Osler & Mark W. Bennett, *A "Holocaust in Slow Motion?": America's Mass Incarceration and the Role of Discretion*, 7 DePaul J. for Soc. Just. 117, 141 (2014)

**§2F1.1.    Fraud and Deceit**

    (a)   Base Offense Level: **6**

    (b)   Specific Offense Characteristics

        (1)   If the estimated, probable or intended loss exceeded $2,000, increase the offense level as follows:

| | Loss | Increase in Level |
|---|---|---|
| (A) | $2,000 or less | no increase |
| (B) | $2,001 - $5,000 | add 1 |
| (C) | $5,001 - $10,000 | add 2 |
| (D) | $10,001 - $20,000 | add 3 |
| (E) | $20,001 - $50,000 | add 4 |
| (F) | $50,001 - $100,000 | add 5 |
| (G) | $100,001 - $200,000 | add 6 |
| (H) | $200,001 - $500,000 | add 7 |
| (I) | $500,001 - $1,000,000 | add 8 |
| (J) | $1,000,001 - $2,000,000 | add 9 |
| (K) | $2,000,001 - $5,000,000 | add 10 |
| (L) | over $5,000,000 | add 11 |

U.S. Sentencing Comm'n Guidelines Manual, § 2F1.1. (October 1987).

The highest offense level a defendant could have attained based on loss amount alone was a level 17. For a first-time offender like Mr. Verne, such an offense level would correspond to a sentence of 24-30 months, without accounting for enhancements or reductions for specific offender characteristics in Chapter 3. It can hardly be said Mr. Verne is twice as bad, or nearly three times as culpable, as the very *worst* fraud defendant sentenced in 1987. But that is exactly how the Guidelines would have him treated. The Court should give a great deal of consideration to the overreliance on loss amount inherent in U.S.S.G. § 2B2.1, and its detachment from any empirical evidence in support of the notion that a sentence based on loss amount as calculated in U.S.S.G. § 2B2.1 is necessary to satisfy either the specific sentencing factors identified in 18 U.S.C. § 3553 or the overarching mandate to impose a sentence "sufficient but not greater than necessary" to comply with those purposes.

14

B.  The Obstruction Enhancement

Mr. Verne objects to the application of a 2-level enhancement for obstruction of justice. PSR ¶ 66. Sentencing Guidelines § 3C1.1 provides for a two level increase in offense level where "(1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense".

As accurately summarized in the PSR, the claim of obstruction centers on three text messages Mr. Verne sent to Jon Dorfman, his longtime friend, after a telephonic meeting with his prior counsel, government lawyers and FBI agents where Mr. Verne was presented with a preview of the government's potential evidence against him.  Mr. Verne texted Mr. Dorfman that he "just got off the phone" with the government's representatives and found it "interesting what you told them." After receiving no response from Mr. Dorfman, Mr. Verne followed up, "If this goes forward – you should expect other natural questions like bachelor party conversations and other conversations you think would be relevant." Later that evening, the defendant texted Mr. Dorfman's wife that her husband "unfortunately…gave some misinformation [to] the authorities on me and therefore you will be brought into the conversation."

The messages did not contain any threats, explicit or implied. Nor do the messages include any suggestion from Mr. Verne that Mr. Dorfman or his wife should change their potential testimony in any way. Likewise, there is no extrinsic evidence leading to the conclusion these messages were intended to threaten, intimidate or otherwise unlawfully influence either potential witness.  The three messages, sent within hours of each other on the same day, are the only obstructive conduct alleged. Mr. Verne never again contacted the Dorfmans by any other

15

means, nor took (or attempted to take) any kind of action against them. The Probation Officer's response to this objection, on page 45 of the PSR, states in a conclusory fashion that these messages "are on point with the example in Application Note 4" but provides no explanation for how or why the messages should be construed as threatening, intimidating or an attempt to influence a witness. In short, Mr. Verne sent a handful of messages to his friend, upon learning that friend was a potential government witness against him. This immediate reaction by Mr. Verne was in no way threatening or intimidating. Accordingly, the obstruction enhancement should not apply.

IV.    **CONCLUSION**

For all the reasons set forth above, and for reasons that will be articulated at his sentencing hearing on March 4, 2026, Mr. Verne respectfully requests a sentence employing a significant downward variance. Such a sentence is sufficient, but not greater than necessary, to accomplish the goals of sentencing.

Respectfully submitted,

/s/ *Michael McCrossen*
MICHAEL B. M<sup>c</sup>CROSSEN
Assistant Federal Defender

/s/ *Angela Levy*
ANGELA LEVY
Assistant Federal Defender

16

## CERTIFICATE OF SERVICE

I, Angela Levy, Assistant Federal Defender, Federal Community Defender Office for the Eastern District of Pennsylvania, hereby certify that I have caused a copy of the Defendant's Sentencing Memorandum to be filed and served electronically through the Eastern District Clerk's Office Electronic Case Filing System ("ECF") upon Jerome Maiatico and Paul Shapiro, Assistant United States Attorneys, United States Attorney's Office, 615 Chestnut Street, Suite 1250, Philadelphia, Pennsylvania 19106.

/s/ Michael McCrossen
MICHAEL B. McCROSSEN
Assistant Federal Defender

/s/ Angela Levy
ANGELA LEVY
Assistant Federal Defender

DATE: February 25, 2026